# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| A 1994 Ford F150 pick-up truck, red/black in color, bearing license plate MN7741, VIN 1FTEX15N9RKA96465, previously registered to Darren D. Hatchett. | ) ) ) ) ) |

Case No. 19-M-083

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Section 1591(a).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Melissa Fus – Special Agent_
*Applicant's signature*

Wisconsin DCI Special Agent Melissa Fus
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: April 19 2019

*Judge's signature*

City and State: Milwaukee, Wisconsin

David E. Jones , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Melissa A. Fus, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Wisconsin Department of Justice-Division of Criminal Investigation (DOJ-DCI) and have been in law enforcement since 2003.

2. I am currently assigned to the Human Trafficking Bureau for the Wisconsin Department of Justice and also the Federal Bureau of Investigation Wisconsin Human Trafficking Task Force ("WHTTF"). My duties as a Special Agent with the WI DOJ-DCI include human trafficking investigations involving minors and adults. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.

3. I am a federally deputized law enforcement officer.

4. The facts contained in this affidavit are known to me through my personal knowledge, training, and experience, and through information provided to me by other law enforcement officers, who have provided information to me during the course of their official duties and whom I consider to be truthful and reliable. Some of the information was provided in response to administrative subpoenas and search warrants, and I believe that this information is also reliable.

5. I have included here only the information necessary to establish probable cause. There are additional facts and information I have learned through my investigation that are not included herein

## II.     PLACE TO BE SEARCHED AND ITEMS TO BE SEIZED.

6.     I make this affidavit in support of an application for the issuance of a warrant to search a 1994 Ford F150 pick-up truck, red/black in color, bearing license plate **MN7741**, VIN **1FTEX15N9RKA96465** (hereinafter, the **Target Vehicle**, described in Attachment A), previously registered to Darren D. Hatchett in order to order to seize fruits, instrumentalities, and evidence related to possible violations of Title 18, United States Code, Section 1591(a).    The vehicle is currently parked at the Target Residence, located at 3411 W. Clybourn, Milwaukee, WI 53208.

7.     There is probable cause to believe that fruits, instrumentalities, and evidence of these crimes (further described in Attachment B) will be found in a search of the **Target Vehicle**.

## III.     PROBABLE CAUSE

### A.     Human Trafficking of AV-2

8.     I participated in interviews with an adult female (hereinafter referred to as AV-2) (DOB XX/XX/1991).  AV-2 disclosed that she met Hatchett in November 2008 in Indiana.  AV-2 stated that sometime in 2010 or 2011, AV-2 began engaging in prostitution at Hatchett's direction.

9.     In October 2011, AV-2 was interviewed by officers at the Anaheim Police Department in California.  AV-2 stated to those officers that she and Hatchett left Indiana in approximately July 2011 and that shortly thereafter Hatchett instructed her on how to conduct prostitution activities. AV-2 stated she gave Hatchett all the money she made from those activities. A-2 stated that she was never allowed to keep any of the money and that if she wanted anything to eat or drink, she had to ask him for money.

2

10.     AV-2 told Anaheim officers that Hatchett hit her all the time, that he choked her frequently and that, on at least one occasion, he choked her to the point where she passed out.

11.     AV-2 stated to Anaheim officers that Hatchett and AV-2 traveled to Costa Mesa, California, with another adult victim (hereinafter referred to as AV-5) (DOB XX/XX/1990). AV-2 stated that because she was pregnant Hatchett stopped posting her for prostitution dates and started posting AV-5. AV-5 also gave all the money she earned from prostitution activity to Hatchett.

12.     While in Buena Park, California, in the fall of 2011, Hatchett began choking and hitting AV-2 while they were driving. AV-2 escaped by jumping out of the car, and Hatchett pulled her back in by her hair. During this encounter, AV-2 was helped by a man who took her to the police station. After this incident, AV-2 returned to Indiana and gave birth to Hatchett's child.

13.     Based on interviews with AV-2 and others, AV-2 returned to Hatchett in 2015. AV-2 stated that after she returned to Hatchett in 2015 she lived with him in a house the **Target Residence.** She remained living at the **Target Residence** until she left Hatchett in May 2018. AV-2 believed Hatchett owned the house. AV-2 stated that Hatchett would sometimes lock the house to prevent her from leaving, and that he had multiple cameras set up in the interior and exterior of the **Target Residence**.

14.     She again engaged in prostitution at his direction and gave the money she earned from prostitution activity to Hatchett. Hatchett continued to be violent toward AV-2. In 2015, Hatchett broke AV-2's jaw and she had to have it wired shut for approximately six weeks. AV-2 stated that Hatchett's violence toward her was a regular occurrence. Hatchett hit her in the head with guns. On at least two occasions he broke her skull and caused bleeding. He also dragged

her down the stairs, hit her with an electrical cord all over her body, hit her with the handle of a mop or broom, shot at her, and locked her in a dog kennel in a bedroom. While she was in the kennel, Hatchett threatened to shoot her. These instances of abuse, including the time primarily occurred at the **Target Residence**.

15.     AV-2 reported that Hatchett possessed several firearms, which he eventually stored in a large safe at the **Target Residence**. Those firearms included handguns and assault rifles.

16.     In addition to physical violence, Hatchett regularly threatened to harm AV-2's family if she left him and verbally abused AV-2 by calling her stupid and telling her that her brain was messed up.

17.     During her time with Hatchett, AV-2 became addicted to Percocet. According to AV-2 and others, Hatchett withheld opioids from AV-2 as punishment if she did not do what he wanted. He also used Percocet as a reward or incentive to get her to engage in prostitution for his financial benefit.

18.     AV-2 stated that during the time she was with Hatchett she traveled to multiple states, including Arizona, California, Illinois, Texas, New York, Virginia, and Colorado to engage in prostitution.

19.     Multiple other victims and witnesses provided statements to law enforcement about Hatchett and AV-2. Those statements are consistent with AV-2's reports to law enforcement.

20.     Record searches of websites commonly used for prostitution revealed ads for prostitution by AV-2 in Dallas, Kansas City, Virginia, Louisiana, Denver, Milwaukee, Manhattan, South Carolina, and Pennsylvania.

21.     AV-2 stated that she travelled out of state with other women who also engaged in prostitution activity for Hatchett's financial gain.  She identified other adult victims hereinafter referred to as AV-1 (DOB XX/XX/1997), AV-3 (DOB XX/XX/1999), AV-4 (DOB XX/XX/1997), and AV-6 (DOB XX/XX/1994), as women who worked for Hatchett.  AV-2 stated that the state she went to most frequently was Texas.

22.     A search of flight records confirm AV-2's statements.  For example, AV-1 and AV-2 flew from Chicago to Dallas on flights purchased by Hatchett on May 5, 2017, May 25, 2017, and October 25, 2017.  On May 5, 2017, AV-6 also flew with AV-1 and AV-2. On May 30, 2017, AV-1 and AV-2 were the subject of a police report in Irving, Texas, in which the police officers noted evidence of prostitution in the hotel room in which AV-1 and AV-2 were staying.  On April 23, 2018, and April 27, 2018, AV-2 and AV-3 flew to Denver and back on flights paid for by Hatchett.

23.     AV-2 stated that she gave all of the money she earned from prostitution to Hatchett.  AV-2 stated that when she traveled out of state, she would send Hatchett the money made from her prostitution activities by depositing the money in Hatchett's bank accounts.  AV-2 stated that when she was in Texas, she deposited money into Hatchett's bank accounts.

24.     AV-2 also stated that she would sometimes use services such as GoBank and Bluebird to transfer money to Hatchett at gas stations and Wal-Mart.

25.     AV-2 stated that she never had her own money or bank accounts.  AV-2 stated that when she decided to leave Hatchett, she secretly sent some of the money she earned to her mother.  She stated that she was scared of what Hatchett would do if he found out, but that she needed to do so to avoided being stranded with her children.

26.     In May 2018, AV-2 left Hatchett and moved back to Indiana. She had no money. Hatchett has continued to threaten AV-2 and has been physically abusive toward her on at least one occasion since she left him.

**B.      Human Trafficking of AV-5.**

27.     I participated in interviews with AV-5. AV-5 disclosed that she met Hatchett online in 2011 and that on August 26, 2011, Hatchett and AV-2 picked her up in Indiana and drove to Indianapolis. AV-5 believed that she was going to be dancing in a gentleman's club. But when they arrived in Indiana, AV-5 learned that Hatchett intended that she engage in prostitution. In Indianapolis, AV-5 engaged in prostitution for the first time and gave all the money she earned to Hatchett.

28.     AV-5 conducted prostitution activities for Hatchett's financial gain for approximately the next four years.

29.     During that time, Hatchett controlled every aspect of AV-5's life. For example, Hatchett decided what cities they traveled to and when. Hatchett also decided whether, when, and for how long AV-5 was allowed to visit with family. Hatchett also controlled AV-5's social media accounts.

30.     Hatchett's only source of income was the money made by AV-5 and others engaging in prostitution for his benefit.

31.     AV-5 stated that starting in 2015, she and Hatchett resided at the **Target Residence**. They continued to reside there until Harmony left Hatchett in July 2018. Utilities at the **Target Residence** were registered to AV-5 in April 2015. Utilities are current in Hatchett's name.

32.     AV-5 stated that Hatchett was often violent with her. The violence occurred on a regular basis and included Hatchett choking her, breaking her nose, hitting her with guns, shooting at her, pushing her down the stairs, and picking her up by the throat and throwing her to the floor. Much of this violence occurred at the **Target Residence**. AV-5 reported that the **Target Residence** had bullet holes in the walls where Hatchett shot at her and other victims. AV-5 reported that she saw Hatchett shoot at AV-3 in the basement of the **Target Residence**.

33.     AV-5 reported that Hatchett possessed several firearms including assault rifles and that he has a CCW permit.

34.     AV-5 also became addicted to opioids and Hatchett would use that addiction to further control her by, among other things, withholding those opioids as punishment and causing AV-5 to experience withdrawal symptoms.

35.     AV-5 described traveling to a variety of cities and states to engage in prostitution at Hatchett's direction and control. Flight records show that Hatchett and AV-5 flew to Dallas in March and April 2015. Hotel records show that AV-5 often rented hotel rooms in Dallas in 2013 and 2014.

36.     AV-5 also identified other victims of Hatchett's human trafficking, including AV-1, AV-2, AV-4, and AV-6.

37.     AV-5 left Hatchett in July 2018. AV-5 left with no money despite the fact that she estimates she made over a $1,000,000 for him. Hatchett has continued to threaten AV-5 and her family by phone.

**C.     Human Trafficking of AV-1**

38.     In July 2018, I was contacted by Pewaukee Police Department regarding information on AV-1.

39.     Pewaukee Police Sergeant Wright indicated that on July 14, 2018, his agency had contact with AV-1 and her family. At the time of the contact, AV-1's family reported that AV-1 was a victim of Human Trafficking and the family was attempting an intervention with AV-1. AV-1 attempted to evade the intervention and the Pewaukee Police Department was called

40.     Pewaukee Police Department officers described AV-1 as emaciated and having narcotic withdrawal symptoms. They determined that AV-1 had outstanding warrants and she was taken into custody. AV-1's family reported that Hatchett, living at the **Target Residence**, was soliciting AV-1 for prostitution. AV-1's mother reported that AV-1 was a victim of a Human Trafficking ring in Milwaukee and AV-1 has contacted her family members several times to help her get out of the situation. AV-1's mother also told Pewaukee officers that AV-1's boyfriend, Hatchett, was very abusive and possessive. AV-1's mother also told the Pewaukee Police Department officers that AV-1 had a drug addiction. AV-1's mother also advised Pewaukee officers that there were other possible female victims who were at Hatchett's residence, in Milwaukee.

41.     During AV-1's contact with Pewaukee Police Department officers, she disclosed that she resided with a group of girls. AV-1 commented that "she was just happy to be away from the house and out of the situation". AV-1 also told officers that she had not eaten for several days.

42.     I conducted interviews with AV-1's mother and sister. Both indicated to officers that they were aware, based on statements by AV-1, that there were multiple females who reside with Hatchett and conduct prostitution activities for Hatchett.

43.     AV-1's mother said she knew of another female, AV-2, who AV-1 was frequently with.  AV-1's mother indicated that AV-2 has child(ren) with Hatchett but she recently left Hatchett and returned to Indiana.

44.     AV-1's mother also told officers that she knew AV-1 travelled to various states including Texas and New York to engage in prostitution activities for Hatchett.

45.     A forensic examination of AV-1's phones showed numerous communications between AV-1 and male individuals that were consistent with AV-1 conducting prostitution activities.  These conversations show that AV-1 was engaging in prostitution in multiple states including, but not limited to, Texas, California, and New York.  The phone also contained many messages between AV-1 and Hatchett in which Hatchett and AV-1 discussed AV-1's "quota" for prostitution activities and in which Hatchett repeatedly threatened extreme violence against AV-1 and her family.  For example, on March 1, 2018, Hatchett threatened to "rape yo mom and brothers" and "kill yo granny and sister with a meat cleaver."  On another occasion he threatened to beat her head.

46.     During interviews with AV-1, AV-1 stated that she engaged in prostitution while working for Hatchett.  AV-1 stated that she was first introduced to Hatchett by another male, Brian Pointer (DOB XX/XX/1993).  AV-1 stated that she met Pointer on social media and that he recruited her to "work" with him and his girlfriend, AV-4.  Records of AV-1's Facebook account corroborate AV-1's statements that she was initially recruited for prostitution by Pointer who told AV-1 that he and AV-4 were making money while traveling.

47.     AV-1 stated that she moved in with Pointer (to the **Target Residence**) in mid-February 2017.  AV-1 said that after moving into that house, she engaged in prostitution at Pointer's direction and gave all the money she made to Pointer.  AV-1 said that shortly after she

9

moved into the **Target Residence** she traveled to Texas with Pointer and they met AV-4 there. AV-4 and AV-1 engaged in prostitution in Texas and gave the money they made to Pointer. AV-1 flew back to Milwaukee for a court hearing on February 24, 2017. After that she went back to stay at Hatchett's residence, but Pointer was not allowed to return. Shortly thereafter, AV-1 began engaging in prostitution for Hatchett and giving him all the money she made. AV-1 believes that Hatchett did not let Pointer return to the house because Hatchett wanted to control AV-1 and the money she made.

48.     AV-1 stated that shortly after she began engaging in prostitution activities for Hatchett's financial benefit, AV-4 also began working for Hatchett.

49.     AV-1 disclosed that she provided all the money she earned from her prostitution encounters after February 2017 to Hatchett. AV-1 also admitted that Hatchett controlled every aspect of AV-1's life, including who she was allowed to interact with in person and on her social media account. AV-1 also said that Hatchett dictated the cities and states to which she travelled to engage in prostitution activities. AV-1 stated that Hatchett was often violent with her and provided examples, including that on multiple occasions Hatchett choked her and on at least one occasion he shot at her with a firearm at the **Target Residence**. AV-1 disclosed that Hatchett kept a number of firearms in the residence at the **Target Residence**.

50.     During these interviews, AV-1 identified photographs of other victims of Hatchett's human trafficking. Those identifications included, but were not limited to AV-2, AV-3, AV-4, AV-5, and AV-6. AV-1 discussed Hatchett's violence against his victims, particularly AV-2. AV-1 also discussed how Hatchett controlled the number of pills that AV-2 consumed.

51.     AV-1 also talked about her out-of-state travel with the other victims, including AV-2, and their transmittal of all the money they made from prostitutions dates to Hatchett via

bank accounts and other wire transactions. AV-1 reported that she estimates she made $500,000 from prostitution activity while working for Hatchett. When she left Hatchett in July 2018, she had no money.

52. Your Affiant obtained jail calls from the Waukesha County Jail made by AV-1 while AV-1 was incarcerated. The jail calls were dated from July 14, 2018, to November 18, 2018. AV-1 made frequent outgoing phone calls to Hatchett during the above dates. AV-1 frequently called Hatchett "Daddy." Based upon my training and experience, individuals who engage in human trafficking commonly require that the women who engage in prostitution activities for them call them "Daddy."

53. When AV-1 talked to Hatchett on the jail phone, she would occasionally talk to other females who were with Hatchett.

54. During some of the jail calls, Hatchett told AV-1 that he was out-of-state. For example, on November 11, 2018, Hatchett told AV-1 that he just left California and was headed to Denver. Hatchett also told AV-1 that he had been out of town for almost one month, since the day after he visited AV-1 in jail. According to AV-1's visitor log, Hatchett visited AV-1 at the Waukesha County Jail on September 18, 2018. On November 18, 2018, AV-1 asked Hatchett "You back?" and Hatchett replied, "Hell no." Hatchett said he left one light on in the house (the one when you "first walk in") so it didn't "look dead in that motherfucker."

55. During a jail call with Hatchett on October 31, 2018, Hatchett told AV-1 that he could access and control the Facebook accounts of AV-4 and AV-6.

56. AV-1 stated that Hatchett also had access to, and could control, her Facebook account when she was with him. AV-1 stated that Hatchett had control over the account when she went to jail in mid-July 2018. On July 30, 2018, Hatchett (using AV-1's Facebook account)

11

message L.V. and to recruit L.V. to work with AV-1. During that conversation, L.V. wrote that she was threatened by AV-3, but got along with AV-4. Hatchett responded that "Daddy will make her put all that to the side I promise u that" and tells L.V. to text "406-7364." That number belongs to Hatchett. L.V. subsequently asked "Do you get to keep your money and stuff or like half and half or all of it goes to your daddy" and the Facebook account for AV-1 responded: "I'm pretty sure u know the answer to that but I guess it's cute to test the water lol."

### D.    Hatchett's Current Activities and Whereabouts.

57.    Since February 2019, law enforcement has been obtaining prospective location data for Hatchett's phone, (414) 406-7364. Those records reflect that in the last two months, Hatchett has been in the Los Angeles area, San Francisco area, and Denver. In addition, location data for AV-4's and AV-6's phones this month show them in the same areas. Prostitution ads posted online for AV-4 and AV-6 also show them in the same areas as Hatchett's phone.

58.    As of April 18, 2018, Hatchett's phone, AV-4's phone, and AV-6's phone were in Iowa City, Iowa.

59.    As of about 12:30 p.m. on April 19, 2019, Hatchett's phone, AV-4's phone, and AV-6's phone were travelling together from Davenport, Iowa to Illinois on Interstate 88.

60.    As of the afternoon of April 19, 2019, there are two vehicles **(Target Vehicles)** parked at the **Target Residence.**

### CONCLUSION

61.    Based on the foregoing, there is probable cause to believe that Hatchett has engaged in Sex Trafficking by Means of Force, Threats, Fraud, and Coercion against AV-1, AV-2, and AV-5 in violation of 1591(a) and that the fruits, instrumentalities, and evidence of these

crimes (further described in Attachment B) will be found in a search of the Target Vehicle (further described in Attachment A).

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

A 1994 Ford F150 pick-up truck, red/black in color, bearing license plate **MN7741**, VIN **1FTEX15N9RKA96465**, previously registered to Darren D. Hatchett. Currently expired registration.

## ATTACHMENT B

All records relating to violation of 18 U.S.C. §1591(a), from January 2011 to the present, including:

1. Firearms including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, and any and all documentation related to the purchase of such items;

2. All bank records, checks, credit card bills, account information, and other financial records;

3. Financial records reflecting earnings, income, profits, and assets of Hatchett or any entity connected with Hatchett;

4. Records of ownership of online financial accounts such as Gobank or Bluebird;

5. Books, records, receipts, notes, ledgers, airline tickets, money orders, money wire transfer receipts, and other papers relating to the illegal conduct described herein;

6. Proceeds of human trafficking activities including, but not limited to, cash, jewelry, and clothing;

7. Personal telephone books, keys, address books, telephone bills, photographs, videotapes, letters, cables, telegrams, facsimiles, personal notes, documents and other items or lists reflecting names, addresses, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in human trafficking activities;

8. Cellular telephones and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and / or video recordings, pictures, settings, and any other user defined settings and/ or data;

9. Any and all electronic devices, including but not limited to computers, and computer equipment, which may contain digital evidence such as photographs, videos, or communications regarding the illegal conduct described herein;

10. Photographs of Hatchett or any human trafficking victims or which depict evidence of the illegal conduct described herein.

11. Documents and deeds reflecting the purchase or lease of real estate, vehicles, jewelry, clothing, travel, or other items obtained or purchased with the proceeds from human trafficking activities;

12. Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in human trafficking activities;

13. Indicia of ownership of the property, including titles, insurance documents, bills of sale, keys, lease/rental agreements, and loan payment receipts;

14. Controlled or illicit substances, including but not limited to opioids;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).